**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| ANGELA LOCKHART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:18-cv-02586-JPM-cgc |
| v. | ) | |
| | ) | |
| D&S RESIDENTIAL SERVICES, LP, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER GRANTING DEFENDANT D&S RESIDENTIAL'S MOTION TO DECERTIFY
THE FLSA COLLECTIVE ACTION**

Before the Court is Defendant D&S Residential Services, LP's ("D&S") Motion to Decertify the Conditionally Certified Collective Action, filed on April 10, 2020. (ECF No. 88.) D&S moves the Court to decertify this Fair Labor Standards Act ("FLSA") collective action, which the Court conditionally certified on July 9, 2019. (ECF No. 33.) Defendant asserts that Plaintiff Lockhart cannot meet her burden to justify final certification of the collective action for several reasons. (ECF No. 88-7.) First, Defendant argues that the four remaining Opt-Ins assert "varied and inconsistent" FLSA violations and therefore cannot be considered similarly situated. (Id. at PageID 702–03.) Second, Defendant argues that the Opt-Ins' FLSA claims are premised on "different theories of recovery." (Id. at PageID 704–05.) Third, Defendant argues that the Opt-Ins' theories are "markedly different than the theories put forth by Plaintiff." (Id. at PageID 705.) Finally, Defendant argues that allowing the collective action to be certified would prejudice Defendant and for that reason alone should be decertified. (Id.)

Plaintiff filed her Response to the Motion on May 1, 2020.  (ECF No. 90.)  Plaintiff asserts that she and the Opt-Ins are similarly situated because they "shared the same job title," "shared the same essential job duties," and "were subject to the same timekeeping and compensation policies."  (Id. at PageID 718.)  Each of the Opt-Ins, Lockhart contends, were D&S program supervisors.  (Id.)  Plaintiff also asserts that she and the Opt-Ins share a "common legal claim: that Defendant operated under an unwritten policy which discouraged payment for certain forms of overtime work and, under that policy, failed to compensate its Program Supervisors for all of the overtime they worked."  (Id. at PageID 719.)  Plaintiff argues that D&S will assert the same defense with respect to all the Opt-Ins' claims.  (Id.)  Finally, Plaintiff asserts that certification in this case "satisfies Congress's remedial intent behind FLSA collective actions by consolidating many small, related claims of employees for which proceeding individually [would] be too costly to be practical."  (Id. at PageID 720.)

Defendant filed its Reply on May 15, 2020.  (ECF No. 97.)  Defendant asserts that it is "not enough for Plaintiff to make allegations or critique D&S's Motion" to avoid decertification, as Plaintiff bears the burden of demonstrating the appropriateness of final certification of the collective action.  (Id. at PageID 1174.)  Defendant also argues that the record does not support Plaintiff's argument that the Opt-Ins are similarly situated.  (Id. at PageID 1174–75.)  Defendant further argues that any credibility determinations are not appropriate at the decertification stage, and whether or not D&S had "actual or constructive knowledge" of the violations does not suffice to meet Plaintiff's burden.  (Id. at PageID 1175.)  Finally, D&S asserts that the Opt-Ins do not share the same employment settings and factual characteristics.  (Id. at PageID 1177–78.)

For the reasons set forth below, D&S's Motion to Decertify the FLSA Collective Action is **GRANTED**.

2

## I.    BACKGROUND[1]

Plaintiff filed this FLSA collective action on August 28, 2018.  (ECF No. 1.)  Plaintiff

was employed by D&S as a program supervisor from March 2016 to February 2018 at D&S's

Kate Bond Road, Bartlett, Tennessee location.[2]  (Id. ¶¶ 16–17; Scheduling Order, ECF No. 16 at

PageID 51.)  When D&S hired Plaintiff, she was paid on a salaried basis, but in December 2015,

D&S transitioned Plaintiff and other D&S program supervisors from salaried to hourly

employees.  (ECF No. 1 ¶¶ 19–20.)  Plaintiff alleges that after this transition, D&S failed to pay

her and other program supervisors for "all hours worked," including "after hours work," that is,

"work performed after the standard day or on the weekend[.]"  (Id. ¶¶ 20–22.)  Plaintiff also

alleges that Defendant "failed and refused to pay Ms. Lockhart and those similarly situated for

'lunch break' hours actually worked in any given work week."  (Id. ¶ 23.)  Plaintiff asserts that

D&S required its employees to keep "call log[s]" of their hours spent taking work-related phone

calls.  (Id. ¶ 28.)  Allegedly these "logs did not truly reflect the hours" program supervisors

worked, and despite discontinuing their use, D&S provided no suitable alternative for program

supervisors to report time spent on after-hours calls.  (Id. ¶¶ 29–32.)  Plaintiff alleges that she

and other program supervisors were uncompensated for work-related calls taken off the clock.

(Id. ¶¶ 34–35.)

Plaintiff asserts a single FLSA unpaid wages claim against D&S.  (Id. ¶¶ 40–52.)

Plaintiff alleges that Defendant "failed to pay [her] and all others similarly situated for off the

clock hours worked, including on her lunch break and after hours calls."  (Id. ¶ 45.)  D&S

---

[1] All facts are taken from Plaintiff's Complaint and accepted as true solely for purposes of providing the background of the case.

[2] In their respective briefs, the Parties refer to this location as the Memphis, Tennessee D&S location.  See infra Sec. III.

allegedly "failed to pay Ms. Lockhart and all others similarly situated minimum wage and/or an overtime premium for all hours worked in any given workweek." (Id. ¶ 46.) Plaintiff alleges that D&S was aware its employees were working off the clock because it previously required its employees to "report work performed after hours" and that, "despite discontinuing the practice of reporting hours worked after hours, [D&S] required [its employees] to continue working off the clock." (Id. ¶ 48.) Plaintiff also alleges that D&S's conduct constitutes willful violations of the FLSA. (Id. ¶ 52.)

### A.    *Procedural Background*

Plaintiff filed her Complaint on August 28, 2019. (ECF No. 1.) Defendant filed its Answer on October 31, 2018. (ECF No. 13.) On November 5, 2018, the Court entered a scheduling order. (ECF No. 16.) The Court set the schedule for conditional certification, which was to begin with Plaintiff's filing of her motion for conditional certification by January 31, 2019. (Scheduling Order, ECF No. 16 at PageID 51.) On motion, the Court extended the deadline to February 15, 2019. (ECF No. 26.)

On February 15, 2019, Plaintiff filed her Motion for Conditional Certification. (ECF No. 29-1.) On June 17, 2019, Defendant filed its Response to the Motion. (ECF Nos. 34, 35.) Plaintiff filed her Reply on June 28, 2019. (ECF No. 43.) Plaintiff also moved to extend the close of discovery on June 7, 2019, to which Defendant filed a response on June 21, 2019. (See ECF Nos. 32, 37.) The Court held a telephonic hearing on June 28, 2019 to discuss the outstanding motions. (ECF No. 42.) Plaintiff then filed a reply brief in support of its motion to conditionally certify the class on June 28, 2019. (ECF No. 43.)

On July 9, 2019, the Court entered an Order Granting the Motion to Conditionally Certify the Collective Action and Order Granting the Motion for Extension of the Discovery Deadline. (ECF No. 44.)  The Court first found that "Plaintiff ha[d] made a factual showing that D&S discourages the reporting of on-call hours by presenting employees with an infeasible authorization requirement," and that "Plaintiff ha[d] sufficiently shown that she is similarly situated to other Program Supervisors, who were allegedly discouraged from reporting their overtime hours by D&S's policy requiring prior approval for on-call overtime work that often arises without notice."  (ECF No. 44 at PageID 361.)  The Court certified the case as a collective action under 29 U.S.C. § 216(b), holding that:

> Plaintiff is hereby AUTHORIZED to proceed on behalf of Program Supervisors employed by D&S from December 1, 2016 to the present who worked off-the-clock hours and were denied the statutory required minimum wage and/or overtime premium for those on-call hours . . . . The Defendant shall produce a list containing the names, the last known addresses, and the last known email addresses for all Program Supervisors of Defendant nationwide for the past three years that worked on-call hours.

(ECF No. 44 at PageID 362–63.)  The Court then extended the close of discovery to December 31, 2019.  (ECF No. 45 at PageID 367.)

Defendant filed a Motion to Clarify/Modify the Court's Conditional Certification Order on July 23, 2019.  (ECF No. 47.)  Defendant requested that the Court clarify or modify the terms of its order by "clarify[ing] that the [conditionally certified class] is limited to the theory on which the Court granted conditional certification—i.e., those Program Supervisors that experienced an infeasible authorization requirement—and that it does not include a 'minimum wage' violation or claim," limiting the collective geographically to Memphis rather than nationwide, and "clarify[ing] that the relevant time period for the collective is December 1, 2016 to present, not the past three years."  (Id. at PageID 375.)

On August 16, 2019, the Court entered an Order Granting in Part and Denying in Part the Motion to Modify.  (ECF No. 55.)  The Court denied Defendant's request to "strike [the] minimum wage aspect of the conditionally certified collective" and clarified that the collective included "Program Supervisors employed by D&S who worked off-the-clock hours and were not paid the statutory required minimum wage and/or overtime premium for those on-call hours," rather than those who "were *denied* the statutory required minimum wage and/or overtime premium for those on-call hours."  (ECF No. 55 at PageID 407–08 (emphasis in original).)  The Court also denied Defendant's request to limit the scope of the conditionally certified class (the "collective") to Memphis D&S program supervisors and clarified that the class only covered program supervisors who did not receive their required minimum/overtime wages from December 1, 2016 to the present.  (Id. at PageID 408–09.)

The Second Amended Scheduling Order set the notice period for potential opt-ins.  (ECF No. 56.)  Plaintiff began sending notices to potential opt-ins on September 9, 2019.  (ECF No. 59.)  In total, eleven plaintiffs consented to join the collective action.  (See ECF Nos. 60–65, 68.)  On November 22, 2019, the Court entered the Third Amended Scheduling Order, which extended the close of discovery to February 29, 2020.  (ECF No. 70.)

On February 3, 2020, Plaintiff filed her First Motion for Leave to Amend her Complaint.  (ECF No. 74.)  Defendant filed its response on February 18, 2020.  (ECF No. 80.)  The Court denied the Motion on March 17, 2020.  (ECF No. 81.)  The Court found that Plaintiff had not demonstrated the level of diligence necessary to demonstrate "good cause" under Federal Rule of Civil Procedure 16(b)(4), and that Plaintiff sought to add new theories of liability to her Complaint too close to the end of discovery.  (See id. at PageID 551–55.)  The Court also

granted Defendant's Motion to Compel on February 14, 2020, requiring the East Tennessee Opt-Ins to appear for depositions in Nashville, Tennessee.  (ECF No. 79.)

On March 23, 2020, the Parties stipulated to the dismissal of seven of the eleven opt-in plaintiffs.  (ECF No. 82.)  The Court dismissed them from the collective action on March 24, 2020.  (ECF No. 83.)

On April 10, 2020, D&S filed its Motion for Summary Judgment (ECF No. 87) and its Motion to Decertify the Conditionally Certified Collective (ECF No. 88).  Plaintiff filed her Response in Opposition to the Motion to Decertify on May 1, 2020.[3]  (ECF No. 90.)  Defendant filed its Reply in support of decertification motion on May 15, 2020.  (ECF No. 97.)

## II.    LEGAL STANDARD

Employees seeking to proceed in a collective action to recover unpaid wages under the FLSA must demonstrate that they are "similarly situated" to one another.  29 U.S.C. § 216(b); see also O'Brien v. Ed Donnelly Enters., Inc., 575 F.3d 567, 583 (6th Cir. 2009), abrogated on other grounds by Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663 (2016) ("The [FLSA] provides a private cause of action against an employer 'by any one or more employees for and in [sic] behalf of himself or themselves *and other employees similarly situated*." (quoting 29 U.S.C. § 216(b)) (emphasis in original)).  Courts generally consider certification of FLSA collective actions in two stages: (1) conditional certification and (2) final certification.  See Cormer v. Wal-Mart Stores, Inc., 454 F.3d 544, 546 (6th Cir. 2006); see also Frye v. Baptist Mem'l Hosp., Inc., 495 F. App'x 669, 671 (6th Cir. 2012).  Conditional certification takes place before discovery

---

[3] Although Plaintiff filed her Response late, the Court granted the Plaintiff's Unopposed Motion for an Extension of Time to Respond to the Motion to Decertify.  (ECF No. 96.)

has commenced, and courts generally ask whether employees are "'similarly situated' for purposes of the statute's requirements." Cormer, 454 F.3d at 546.  At the conditional certification stage, the Court employs a "fairly lenient standard, [that] typically results in conditional certification of a representative class." Id. at 547 (quoting Morisky v. Pub. Serv. Elec. & Gas Co., 111 F. Supp. 2d 493, 497 (D.N.J. 2000)) (internal quotation marks omitted).

Courts more closely scrutinize the second stage of class certification, which occurs after extensive discovery following the addition of the opt-ins to the collective action.  Monroe v. FTS USA, LLC, 860 F.3d 389, 397 (6th Cir. 2017); see also Cormer, 454 F.3d at 547 ("At the second stage, following discovery, trial courts examine more closely the question of whether particular members of the class are, in fact, similarly situated.").  At this stage, "Plaintiffs generally must produce 'more than just allegations and affidavits' demonstrating similarity in order to achieve final certification." Frye, 495 F. App'x at 671 (quoting Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1261 (11th Cir. 2008)).  Although the FLSA does not provide a definition of what it means for plaintiffs to be similarly situated, courts in this circuit look to three "non-exhaustive" factors to determine whether members of the collective action are similarly situated: (1) the "factual and employment settings of the individual[] plaintiffs"; (2) "the different defenses to which the plaintiffs may be subject on an individual basis"; and (3) "the degree of fairness and procedural impact of certifying the action as a collective action." Monroe, 860 F.3d at 397 (quoting O'Brien, 575 F.3d at 584).  Plaintiffs are similarly situated if they can demonstrate they suffered from "a single, FLSA-violating policy" instituted by the employer defendant, or if their "claims [are] unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct . . . ." Id. at 398 (quoting O'Brien, 575 F.3d at 584–85).  The lead plaintiff bears the burden of

demonstrating that the opt-ins are similarly situated.  O'Brien, 575 F.3d at 584; see also Frye,

495 F. App'x at 672.  The plaintiff's burden to prove that the members of the collective are

similarly situated is less stringent than the plaintiff's required showing of predominance under

Federal Rule of Civil Procedure 23(b).  Monroe, 860 F.3d at 397.

## III.    ANALYSIS

### A.    The Factual and Employment Settings of the Opt-Ins

The Court first considers the Opt-Ins' "job duties, geographic location, supervision, and

salary" under the first O'Brien factor.  Moss v. Crawford & Co., 201 F.R.D. 398, 409 (W.D. Pa.

2000).  Defendant concedes that the Opt-Ins shared the same job title (program supervisor) and

the same job responsibilities.  (See ECF No. 88-7 at PageID 710.)  Plaintiff admits in her

Response that she worked at a different D&S location than three of the four Opt-Ins remaining in

this case (see ECF No. 90 at PageID 718–19), and she has not asserted that each of the program

supervisors worked under the same manager.  See Price v. Acosta, Inc., 03-2686 JPM-dkv, 2008

WL 11320260, at *3 (W.D. Tenn. Feb. 19, 2008) (that plaintiffs "work[ed] in numerous

locations across the country" and "report[ed] to different supervisors" supported decertification).

Three of the Opt-Ins testified that they have no work-related connections to Memphis.  (See

Ferguson Dep., ECF No. 88-5 at PageID 674, p. 34:20-25 ("Q: You never, for example travelled

or worked out of the Memphis office?  A: No, sir.  Q: You never reported to any supervisor or

manager that worked out of Memphis?  A: No, sir."); Brenner Dep., ECF No. 88-3 at PageID

646, pp. 19:23-25, 20:1-5 ("Q: Did you ever report to someone, for example, in Memphis?

A: No.  Q: Did you ever travel to Memphis for any type of training or company events?  A: No.

Q: Were you ever on any phone calls with anyone that you understood to be in Memphis?

A: No."); Quesenberry Dep., ECF No. 88-4 at PageID 656, pp. 19:17-25, 20:1-16 (discussing similar lack of contact with the Memphis D&S locations).)  This information, and the geographic dissimilarity among the Opt-Ins, does not itself support final certification of the collective.  The fact that the Opt-Ins were all D&S program supervisors and had the same job responsibilities, however, does support finding that the members of the collective action are similarly situated. See Pierce v. Wyndham Vacation Resorts, Inc., 922 F.3d 741, 745–46 (6th Cir. 2019) (noting that similarity in job titles, work responsibilities, and schedules supported certification of collective action).  These job-related factors, on balance, would appear to support final certification.

In addition to considering the job-related characteristics of the Opt-Ins under the first O'Brien factor, the Court also considers whether the FLSA violations suffered by the Opt-Ins and Plaintiff were caused by a common D&S policy or practice.  See Monroe, 860 F.3d at 398. Plaintiff asserts the members of the collective action "all assert a common legal claim: that Defendant operated under an unwritten policy which discouraged payment for certain forms of overtime work and, under that policy, failed to compensate its Program Supervisors for all of the overtime they worked, in violation of the FLSA."  (ECF No. 90 at PageID 719.)  Plaintiff asserts that all the Opt-Ins claim "that, in one form or the other, depending on their particular circumstances, the company discouraged compensation for certain types of overtime."  (Id.)  At this stage, "[A]llegations of an 'overarching' policy are insufficient, and plaintiffs are required to produce 'substantial evidence' of a 'single decision, policy, or plan'" to demonstrate that each was similarly situated to one another.  Price, 2008 WL 11320260, at *3 (quoting Moss, 201 F.R.D. at 409–10); see also Crawford v. Lexington-Fayette Urban Cty. Gov't, No. CIV.A. 06-299-JBC, 2008 WL 2885230, at *5 (E.D. Ky. July 22, 2008) ("The plaintiffs must produce

substantial evidence demonstrating that a central policy exists that binds the potential class members together.").  "Although showing a unified policy of violations is not required," it is a material factor in the analysis.  White v. Baptist Mem'l Health Care Corp., No. 08–2478, 2011 WL 1883959, at *8 (W.D. Tenn. May 17, 2011) (quoting O'Brien, 575 F.3d 585) (internal quotation marks omitted).  If the plaintiff can prove that she and the other members of the collective action suffered from a single, FLSA-violating policy, "[t]he existence of this commonality may assuage concerns about plaintiffs' otherwise varied circumstances."  Wilks v. Pep Boys, No. 3:02-0837, 2006 WL 2821700, at *3 (M.D. Tenn. Sept. 26, 2006).

Plaintiff has not provided substantial evidence supporting a finding that D&S deprived the Opt-Ins of overtime or minimum wages based on D&S's alleged policy of discouraging its program supervisors from reporting off the clock overtime hours.  Most of the Opt-Ins, in fact, testified that no one at D&S discouraged them from reporting their hours or working overtime.  Opt-In Singleton, the only other Memphis-based program supervisor in this collective action, testified that "no one at the company discouraged [her] from completing or filling out a call log" for work-related phone calls taken after regular hours.  (Singleton Dep., ECF No. 88-2 at PageID 636, p. 18:17-25.)  Singleton further testified that D&S management never discouraged her from reporting overtime or threatened her with discipline for reporting overtime.  (Id. at PageID 636–37, pp. 19:6-22, 25:10-14.)  Two of the other Opt-Ins testified similarly that D&S did not discourage them from reporting overtime, nor did D&S threaten to take disciplinary action against them for reporting overtime.  (Brenner Dep., ECF No. 88-3 at PageID 645, pp. 16:18-25, 19:1-4, PageID 649, p. 29:10-13; Ferguson Dep., ECF No. 88-5 at PageID 674, p. 33:9-24.)

Plaintiff asserts that Opt-In Quesenberry, "[i]n language very similar to Ms. Lockhart's, . . . described an office culture which strongly discouraged the entry of overtime

hours, although management knew too well that a Program Supervisor's job took far more than 40 hours per week." (ECF No. 90 at PageID 722.) It is true that a portion of his deposition testimony indicates that one of his supervisors, Sherry Cooke, "deterred" program supervisors from taking overtime and "encouraged [them] to stay off the clock . . . to avoid overtime." (ECF No. 88-4 at PageID 655, p. 15:10-12.) But only two of the five members of the collective action experienced the effects of D&S's "overarching policy" of discouraging or prohibiting its employees from reporting overtime or off the clock hours worked.

The Court recognizes that the concept of a common policy should not be restrictively applied, as an employer may "use[] multiple means" to effectuate its common policy of discouraging its employees from reporting overtime. Monroe, 860 F.3d at 403. Even liberally construed, however, it is hard to discern an overarching companywide policy from the disparate nature of the Opt-Ins' allegations of under compensation. Plaintiff asserts that each of the Opt-Ins has presented evidence that they suffered "consistent" forms of unpaid overtime injuries. (See ECF No. 90 at PageID 721–22.) The portions of the Opt-Ins' depositions cited by Plaintiff's Response only indicate that D&S failed to pay Plaintiff and the Opt-Ins for all hours worked; that they suffered identical injuries, that is, unpaid overtime, does not demonstrate that D&S failed to pay their employees as a result of a common policy discouraging Plaintiff and the Opt-Ins from reporting overtime. (Id.) It is true that a common theme emerges from the Plaintiff's and the Opt-Ins' testimony: the nature of their jobs as program supervisors required them to work long hours, often past their regularly scheduled hours, and D&S did not compensate them for all hours worked. (See id. at PageID 722–23.) Their testimony does not, however, demonstrate a common policy, practice or custom of discouraging employees from reporting hours worked outside of their normal hours. (See id. at PageID 722–23.) For example,

Plaintiff points to several lines of Opt-In Ferguson's deposition testimony for the proposition that "following the company manual and with the knowledge and blessing of HR, she deducted travel time spent performing her routine supervisorial duties from her overall time submitted." (Id. at PageID 722–23.) Although her deposition testimony indicates that she rounded her time with the permission of HR to make it easier on HR to calculate her time, Ferguson's testimony does not indicate that D&S *discouraged* her from reporting her after hours work. (See Ferguson Dep., ECF No. 88-5 at PageID 675–76, pp. 38:4–41:16.) Ferguson also admitted in her testimony that in her self-rounding, she would often "balance[] out" her time; she would compensate for any time that she rounded down to D&S's advantage by rounding up her time later in the day to her own advantage. (Id. at PageID 678, pp. 49:2-25, 50:1-4.) It is therefore questionable whether Ferguson even has a viable FLSA claim against D&S.

Nor does the testimony of Opt-In Singleton, cited by Plaintiff, demonstrate that she suffered an injury as a result of D&S's policy to *discourage* program supervisors from reporting overtime hours. (See ECF No. 90 at PageID 723.) The portions of Singleton's deposition testimony cited in Plaintiff's Response indicates that although Singleton informed management that she was to be paid overtime, and that "payroll" indicated that she would be paid for that uncompensated time "retro" (applied to her next paycheck), she never received her overtime pay. (Singleton Dep., ECF No. 88-2 at PageID 634–35, pp. 11:13–13:22.) Again, although this may demonstrate an FLSA violation, it does not suggest that the harm was the result of or was caused by D&S's *overarching policy to discourage its employees from reporting overtime hours*. (Id.)

Opt-In Brenner's claims fare no better. Her testimony indicates that she worked 24/7 as a program supervisor, and that she may not have received compensation for travel time to and from the office. (Brenner Dep., ECF No. 88-3 at PageID 645, pp. 13:2, 15:8.) Once again,

however, Plaintiff has not provided "substantial evidence" of how Brenner's under compensation, or D&S's under compensation of the other Opt-Ins, for that matter, resulted from D&S's companywide or Tennessee-wide policy of discouraging its employees from reporting overtime.  See Price, 2008 WL 11320260, at *3 (finding that disparate evidence of the ways in which the employer violated the FLSA did not demonstrate a common policy of refusing overtime compensation); see also Oetinger v. First Residential Mortg. Network, Inc., No. 3:06–CV–381–H, 2009 WL 2162963, at *3 (W.D. Ky. July 16, 2009) ("[C]ompanies may indeed apply company-wide policies to their employees, but these policies must cause the alleged FLSA violation for the policy to be considered as a factor in determining whether employees are 'similarly situated' for purposes of bringing a collective action.").

Although Plaintiff cannot prove that she and the Opt-Ins suffered their alleged FLSA violations as a result of a "'unified policy' of violations," she can still demonstrate that members of the collective action are similarly situated under the first O'Brien factor if she can show that the Opt-Ins are "unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct."  Monroe, 860 F.3d at 398 (quoting O'Brien, 575 F.3d at 584–85).  However, plaintiffs cannot survive decertification "merely because they recite a common theory of liability"; they must "produce substantial evidence" of a common theory of liability.  Cornell v. World Wide Bus. Servs. Corp., No. 2:14-cv-27, 2015 WL 6662919, at *3 (S.D. Ohio Nov. 2, 2015) (citing Reed v. Cty. of Orange, 266 F.R.D. 446, 458 (C.D. Cal. 2010)).  The standard required to show a common theory or theories of liability is "less stringent" than the standard under Rule 20(a) joinder or Rule 23(b)(3)'s requirement that common questions predominate over the individual claims.  Perez v. A+ Bldg. Maint. & Home Repair, LLC, No. 3:17CV01261, 2018 WL 2002420, at *2 (N.D. Ohio Apr. 30,

14

2018) (quoting O'Brien, 575 F.3d at 584).  Examples of common theories of liability include "forcing employees to work off the clock" and "improperly editing time-sheets."  O'Brien, 575 F.3d at 585–86.

Plaintiff's asserted theories of FLSA violations allegedly shared by the Opt-Ins and Plaintiff overlap significantly with her asserted unifying D&S common policy or practice. Plaintiff insists that the Opt-Ins have demonstrated through their deposition testimony their shared experiences working at D&S, as the Opt-Ins and Plaintiff have "described the draconian requirement that they answer their phones at all hours of the night and weekends, causing constant disruption to sleep and family life, and preventing them from enjoying anything approaching a normal life."  (ECF No. 90 at PageID 725.)  Plaintiff further alleges that "they described a culture which discouraged entry of overtime hours, but took working overtime as a given.  Consequently, the named plaintiff and the opt-ins form a unified body of injured persons, sharing in common basic circumstances of employment and asserting a common cause of action."  (Id.)

The demanding nature of the Opt-Ins' positions as program supervisors does not in and of itself support a finding that D&S violated the FLSA.  That the Opt-Ins all worked long hours and were required to work late into the night does not demonstrate a common theory of the ways in which D&S deprived its program supervisors of overtime compensation.  (See ECF No. 90 at PageID 725.)  It is the denial of overtime compensation that forms the basis of an FLSA violation.  See 29 U.S.C. § 207(a)(1) ("[N]o employer shall employ any of his employees . . . for a workweek longer than forty hours *unless* such employee receives compensation for his employment in excess of [forty hours] specified at a rate not less than one and one-half times the regular rate at which he is employed." (emphasis added)).

Additionally, contrary to Plaintiff's assertion, most of the Opt-Ins were not discouraged or prevented by D&S from reporting overtime hours.  (Singleton Dep., ECF No. 88-2 at PageID 636–37, pp. 18:17-25, 19:6-22, 25:10-14; Brenner Dep., ECF No. 88-3 at PageID 645, pp. 16:18-25, 19:1-4, PageID 649, p. 29:10-13; Ferguson Dep., ECF No. 88-5 at PageID 674, p. 33:9-24.)  Even if it were undisputed that the culture at D&S "took working overtime as a given," Plaintiff has not provided substantial evidence demonstrating that the Opt-Ins "described a culture which discouraged entry of overtime."  (ECF No. 90 at PageID 725.)

The injuries suffered by the Opt-Ins also do not support a finding that the Opt-Ins' claims share a common theory of recovery.  Defendant's Motion accurately summarizes the inherent differences between the recovery sought by the Opt-Ins.  (See ECF No. 88-7 at PageID 704.)  For example, Ferguson seeks to recover time she failed to report for travel to and from work, because she self-rounded her time to make it easier on D&S human resources  (ECF No. 88-5 at PageID 675–76, pp. 38:4–41:16), and Singleton seeks to recover unpaid "retro" pay, that is, overtime pay that she reported, brought to the attention of her supervisor, and ultimately never received.  (Singleton Dep., ECF No. 88-2 at PageID 634–35, pp. 11:13–13:22.)  Although this evidence supports the proposition that D&S failed to pay each of these program supervisors their overtime hours worked, it does not demonstrate a "common theory" of FLSA violations.  See Frye, 495 F. App'x at 673 ("Frye's evidence, while perhaps indicative of individual FLSA violations, fails to demonstrate similarly situated plaintiffs experiencing a common FLSA injury.").  Moreover, Plaintiff's own Response demonstrates key differences between the nature of the Opt-Ins' claims; she admits significant distinguishing characteristics between the Opt-Ins' FLSA injuries.  (See ECF No. 90 at PageID 726.)

The testimony of the Opt-Ins also differs in material ways from the testimony of Lead-Plaintiff Lockhart.  Lockhart seeks to recover unpaid overtime for hours worked off the clock, that is, hours she never reported to D&S management because of its underlying policy of discouraging employees from reporting overtime.  (See ECF No. 90 at PageID 723–24.)  In contrast, most of the Opt-Ins seek to recover unpaid overtime or minimum wages for hours that were, in fact, *reported* but never paid.

The Sixth Circuit's unpublished opinion in Frye is particularly instructive.  In Frye, the Sixth Circuit affirmed the district court's decertification of an FLSA collective action that was premised on the theory that the defendant violated the FLSA by "fail[ing] to monitor its automatic-deduction policy for FLSA violations" and "inadequate[ly] training [its] supervisors and employees to prevent such violations from happening."  Id. at 670.  The Sixth Circuit described the evidence of a common theory or practice provided by the plaintiff:

> Addressing that requirement, Frye points to deposition testimony showing that some opt-in plaintiffs did not know their compensation rights with regard to interrupted meal breaks, others voluntarily declined to report work performed during their lunch breaks, and still others lunched at their workstation without realizing that it entitled them to compensation. The lengthy string citation he offers in support refers to a document excerpting various depositions, leaving for the court to weave common factual threads.

Id. at 672.  The Sixth Circuit found that "Frye's evidence, while perhaps indicative of individual FLSA violations, fails to demonstrate similarly situated plaintiffs experiencing a common FLSA injury."  Id. at 673.  The Sixth Circuit further held that although the "absence of a common theory of FLSA violation . . . [is] not fatal to certification in O'Brien, [it] weighs against certification here because of the dissimilarities in plaintiffs' work experiences."  Id.

Here, Plaintiff presents evidence of potential FLSA violations but fails to demonstrate that each of the Opt-Ins shared a common FLSA injury.  See id.; see also Creely v. HCR

ManorCare, Inc., 920 F. Supp. 2d 846, 856 (N.D. Ohio 2013) ("Defendant has demonstrated inconsistencies among and within opt-in Plaintiffs' testimony.  While the record is perhaps indicative of individual FLSA violations, the evidence as a whole does not demonstrate 'similarly situated plaintiffs experiencing a common FLSA injury.'" (quoting Frye, 495 F. App'x at 673)).  The Opt-Ins are not bound by the alleged unifying theory proposed by Plaintiff, and the differences between their claims outweigh the similarities.  See Frye, 495 F. App'x at 673.

Plaintiff also asserts that, despite their differences, each of the Opt-Ins share but one legal theory of recovery: "that Defendant failed to compensate them for overtime hours that it knew or should have known they had worked."  (ECF No. 90 at PageID 725.)  But asserting that D&S's failure to provide overtime compensation qualifies as a common theory of FLSA violations sweeps with too broad a stroke.  Examples of theories of recovery include "forcing employees to work off the clock" and "improperly editing time-sheets," see O'Brien, 575 F.3d at 585–86, or a defendant's "use of an automatic-deduction policy" to calculate pay, see Frye, 495 F. App'x at 673.  Accepting Plaintiff's argument, each of these theories would qualify as a single theory of recovery, which would render meaningless any distinctions between them.  The efficiencies gained by collective actions would also be lost if the Court were to allow all individuals who suffered FLSA violations at the hands of D&S to join in a collective action on the sole basis that they were deprived of overtime compensation; it would unnecessarily join together disparate individual experiences under a common umbrella of FLSA violations.  See Frye, 495 F. App'x at 673; see also Creely, 920 F. Supp. 2d at 856.

Finally, the Court notes that Plaintiff may have recognized the need to spell out additional theories of FLSA violations based on the disparate nature of the Opt-Ins' FLSA claims when she filed her Motion for Leave to Amend the Complaint.  (See ECF No. 81.)  Plaintiff's

18

proposed amended complaint asserted several new theories of recovery.  (See ECF No. 74-1.)

Plaintiff sought to amend her Complaint after Plaintiff's counsel had "interviewed all twelve

[opt-in] plaintiffs, at four separate D&S locations in four different Tennessee Counties," which

provided Plaintiff's counsel with "a much more thorough understanding of the multitude of ways

in which Defendant deprived its Program Supervisors of the statutorily-required minimum wage

and overtime premium for off-the-clock hours worked."  (ECF No. 81 at PageID 547.)  In

rejecting her Motion, the Court noted that the proposed amended complaint "assert[ed] brand

new allegations against D&S, specifically Count II ('Failure to compensate for 'on-call' hours')

and III ('Failure to compensate for travel time')."  (Id. at PageID 554–55.)  The Court explicitly

found these to constitute "new theories of recovery" rather than additional facts fleshing out

already asserted theories of recovery.  (Id. at PageID 555.)  The Opt-Ins' allegations against

D&S overlap remarkably well with the new theories of recovery that were asserted by the

proposed amended complaint, further supporting the Court's finding that each of these Opt-Ins

asserts a different theory of recovery for FLSA violations.

     In summary, the Court finds that the first O'Brien factor does not support final class

certification.  Although Plaintiff has presented evidence of a variety of FLSA violations suffered

by the Opt-Ins, the fact that each of the Opt-Ins had disparate work experiences, worked in

different offices and under different supervisors, and were deprived of overtime in different ways

cuts in favor of decertification.

     B.    *The Individual Defenses to each of the Opt-Ins' Claims*

     The second of the O'Brien factors requires consideration of "the different defenses to

which the plaintiffs may be subject on an individual basis."  Monroe, 860 F.3d at 397 (quoting

O'Brien, 575 F.3d at 584).  "[I]ndividualized defenses alone do not warrant decertification where sufficient common issues or job traits otherwise permit collective litigation."  Id. at 404.  That said, the "presence of many individualized defenses makes a representative class unmanageable, and 'several courts have granted motions for decertification on this basis.'"  Cornell, 2015 WL 6662919, at *4 (quoting Crawford, 2008 WL 2885230, at *9) (collecting cases).

Here, Defendant asserts that it will be required to assert distinct defenses to rebut the Opt-Ins' FLSA claims.  (See ECF No. 88-7 at PageID 711–12.)  Specifically, D&S asserts that it will be required to assert four different defenses, including (1) "that unpaid work falls within the FLSA's *de minimis* exception"; (2) "that the Opt-Ins failed to utilize avenues for reporting their compensable hours"; (3) "that the Opt-Ins failed to utilize avenues for reporting workplace concerns"; and (4) "that even if D&S violated the FLSA with respect to any one Opt-In . . . it did not do so willfully."  (Id.)  D&S asserts that the "witnesses and proof to maintain these defenses are all different."  (Id. at PageID 712.)  Plaintiff argues that Defendant will only have one defense to all the Opt-Ins' claims: "that the plaintiffs either did not work the overtime hours claimed or that these hours are somehow exempt from the FLSA's overtime pay requirements." (ECF No. 90 at PageID 719.)

Whether Defendant would assert a single, unitary defense against the Opt-Ins' claims does not counsel against decertification, as Plaintiff has failed to "produce the significant evidence of a unified policy or common theory of violations required by the first factor of the similarly situated analysis."  Frye, 2010 WL 3862591, at *9 (citation omitted).  The Court also agrees with Defendant that the fact that the Opt-Ins each assert unique theories of FLSA violations that did not result from common D&S policies makes it more likely than not that Defendant will be required to assert individualized, disparate defenses to the Opt-Ins' claims.

See Price, 2008 WL 11320260, at *4.  For example, Defendant will likely assert the *de minimis* work doctrine defense against Opt-In Ferguson's self-rounding claim described supra.  See Brock v. City of Cincinnati, 236 F.3d 793, 804 (6th Cir. 2001) (discussing the "*de minimis* work doctrine").  See supra Sec. III.A.  (Ferguson Dep., ECF No. 88-5 at PageID 675–76, pp. 38:4–41:16; PageID 678, pp. 49:2-25, 50:1-4.)  It is not clear that this defense will apply to any of the other Opt-Ins' claims.

Additionally, because the Opt-Ins' FLSA claims involve several managers and separate D&S offices, and because their asserted allegations are largely based on D&S's constructive or actual knowledge that its employees were working overtime (see Response, ECF No. 90 at PageID 725), the defenses to each of the Opt-Ins' claims will require different and distinct evidence.  See Creely, 920 F. Supp. 3d at 856–57 (discussing how knowledge-based claims require individualized proof and defenses).  Plaintiff's own argument belies her assertion that Defendant will assert the same or common defenses to rebut each of the Opt-Ins' claims.  The Opt-Ins' discrete claims are only tangentially related to Plaintiff Lockhart's alleged discouragement theory, and the Opt-Ins' different work experiences at D&S, particularly with respect to their ability to report overtime, will more likely than not require Defendant to assert separate defenses to each claim.  (See ECF No. 90 at PageID 723–25, 726–27.)

In summary, the second O'Brien factor supports decertification of this collective action.

C.     *The Degree of Fairness and Procedural Impact of Certifying the Action as a Collective Action*

Under the third O'Brien factor, the Court must consider whether treatment of the case as a collective action "comports with the purposes of the FLSA, which Congress intended to be

'broadly remedial and humanitarian.'" Frye, 2010 WL 3862591, at *9 (quoting Wilks, 2006 WL

2821700, at *8).  Courts balance the equities and the increased judicial economy of allowing the

case to proceed collectively against the detriment to the defendant and the possibility of judicial

inefficiency posed by allowing the case to proceed as a collective action.  Id.; see also Fenley v.

Wood Grp. Mustang, Inc., 325 F.R.D. 232, 247 (S.D. Ohio) ("[The third O'Brien factor requires]

courts to consider whether continuing the collective action comports with the policy behind

FLSA collective actions and Congress's remedial intent by consolidating any small, related

claims of employees for which proceeding individually would be too costly to be practical.'"

(quoting Monroe, 860 F.3d at 405)).  In considering this factor, courts must not interpret the

FLSA in a "narrow, grudging manner."  Dunlop v. Carriage Carpet Co., 548 F.2d 139, 144 (6th

Cir. 1977); see also Frye, 2010 WL 3862591, at *9.  That said, "[T]he remedial nature of the

FLSA, standing alone, does not justify allowing a case to proceed collectively . . . ."  Falcon v.

Starbucks Corp., 580 F. Supp. 2d 528, 541 (S.D. Tex. 2008).

     Plaintiff asserts, without any citations to case law or to the record, that "this case satisfies

Congress's remedial intent behind FLSA collective actions by consolidating many small, related

claims of employees for which proceeding individually [would] be too costly to be practical."

(ECF No. 90 at PageID 720.)  Specifically, Plaintiff asserts that requiring all four of the Opt-Ins

to proceed individually would be "procedurally inefficient and manifestly unfair," and that

because the Opt-Ins have "all invested considerable time and energy in preparing for their

depositions and most travelled a considerable distance to Nashville to participate" and are of

"modest means," it is unlikely that they could proceed on their own if the case was decertified.

(Id.)  Defendant asserts that not only can the Opt-Ins proceed on their own (as one of the already-

dismissed Opt-Ins has), "the factual and legal differences among and between the claims of

Plaintiff and the Opt-Ins" outweigh any efficiencies gained if the Opt-Ins could proceed collectively.  (See ECF No. 88-7 at PageID 712.)

Plaintiff has not demonstrated how the efficiencies of proceeding in a collective action outweigh the potential harm to the other Opt-Ins if the case is decertified.  Plaintiff's argument rests almost entirely on the remedial nature of the FLSA, which is not enough, standing alone, to prevent decertification.  See Starbucks, 580 F. Supp. 2d at 541; see also Crawford, 2008 WL 2885230, at *11.  The modest means of the Opt-Ins do not by themselves justify allowing this collective action to proceed.  That Plaintiff filed this case in Memphis, which required the East Tennessee Opt-Ins to travel to Nashville for their depositions, thereby detrimentally impacting the Opt-Ins' financial situation, is not enough to justify certification, and this fact further justifies why a case involving D&S program supervisors from a D&S office located on the other side of Tennessee should try their own cases in separate actions, or in a separate collective action, outside of Memphis.  (See Mot. to Compel, ECF No. 75 at PageID 495; see also O. Grant. Mot. to Compel, ECF No. 79 at PageID 520.)  Although the potential for "mini-trials" within an FLSA proceeding does not alone justify decertification, such "mini-trials" in this case would result in unfairness to Defendant and would be inefficient, especially given that the Opt-Ins are not similarly situated and their claims do not assert a common unlawful policy or practice, or a common theory of FLSA violations.  Cornell, 2015 WL 6662919, at *5; see also White, 2011 WL 1883959, at *14 (When plaintiffs are unable to demonstrate that employees are similarly situated, "there is no judicial economy to be gained by allowing their claims to proceed collectively.  The only possible results are unfairness to [the defendant] and manageability problems for the Court.").  Finally, the Court notes that the Opt-Ins would not be barred from refiling their claims after they are dismissed without prejudice.  See Betts v. Cent. Ohio Gaming

Ventures, LLC, 351 F. Supp. 3d 1072, 1077 (S.D. Ohio 2019) ("[I]n situations where court delay

has time-barred a sizeable number of potential plaintiffs, many courts find that the delay alone

warrants equitable tolling and decline to analyze the typical equitable tolling factors."); see also

Kampfer v. Fifth Third Bank, No. 3:14-cv-2849, 2016 WL 1110257, at *7 (N.D. Ohio Mar. 22,

2016) (finding that a six-month court delay warranted equitable tolling when the plaintiff had

diligently asserted her FLSA claim).

     In summary, all the O'Brien factors weigh in favor of decertification.  The Court will

therefore decertify this collective action.

## IV.    CONCLUSION

     For the foregoing reasons, D&S's Motion to Decertify the Collective Action is

**GRANTED**.  The Court hereby decertifies the collective action in this case, and all Opt-Ins

remaining in this case are hereby **DISMISSED WITHOUT PREJUDICE**.

     **SO ORDERED**, this 13th day of August, 2020.

       /s/ Jon P. McCalla
       JON P. McCALLA
       UNITED STATES DISTRICT COURT JUDGE